# In the United States Court of Federal Claims

No. 22-1592C
(Filed Under Seal: August 14, 2023)
(Reissued: September 6, 2023)*
**FOR PUBLICATION**

***************************************
ACCURA ENGINEERING AND              *
CONSULTING SERVICES, INC.,          *
                                    *
                Plaintiff,          *
                                    *
v.                                  *
                                    *
THE UNITED STATES,                  *
                                    *
                Defendant,          *
                                    *
        and                         *
                                    *
VANGUARD PACIFIC, LLC,              *
                                    *
        Defendant-Intervenor.       *
                                    *
***************************************

*Diana Lyn Curtis McGraw*, Fox Rothschild LLP, Washington, D.C., for Plaintiff. With her on briefs was *David Timm*, Fox Rothschild LLP, Washington, D.C.

*Tanya B. Koenig*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant, United States. With her were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Civil Division, *Patricia M. McCarthy*, Director, *Eric P. Bruskin*, Assistant Director, and *Sonia Williams Murphy*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., as well as *Adam Supple* and *Rosalind Cylar*, National Aeronautics and Space Administration.

---

* Pursuant to the protective order in this case, the Court initially filed this opinion under seal on August 14, 2023, for the parties to propose redactions of confidential or proprietary information. *See also* Order (ECF 46). The parties submitted proposed redactions and a supporting memorandum. The Court has incorporated the proposed redactions and makes them with bracketed ellipses ("[. . .]") below.

*Stephanie Diane Wilson*, Berenzweig Leonard, LLP, McLean, VA, for Defendant-Intervenor.

## OPINION AND ORDER

Plaintiff Accura Engineering and Consulting Services, Inc. ("Accura") protests rejection of its bid to provide architecture and engineering ("A&E") services to the National Aeronautics and Space Administration ("NASA"). *See* Complaint (ECF 1). The successful bidder, Vanguard Pacific, LLC ("Vanguard") has intervened. *See* Order (ECF 13). The parties' cross-motions for judgment on the administrative record are fully briefed and argued.[1]

Several of Accura's claims are unsupported by the administrative record. But I agree with Accura that NASA's evaluation of bids violated statutory requirements for procurement of A&E services. Accura's Motion for Judgment on the Administrative Record is therefore **GRANTED**, and the government's and Vanguard's motions are **DENIED**. The case is **REMANDED** for further proceedings. The government is **ENJOINED** from actions inconsistent with this Opinion, as specified below.

## BACKGROUND

Synopsis No. 80MSFC21R0007 ("the Synopsis") initiated a procurement for A&E services at certain NASA facilities. *See* Administrative Record ("A.R.") at 22 (original Synopsis); A.R. at 30 (final Synopsis amendment). The procurement was designated as an 8(a) small-business set-aside. A.R. at 30; *see* 15 U.S.C. § 637(a). The Synopsis contemplated award of a single contract. A.R. at 30.

Procurements for A&E services are governed by the Brooks Act, 40 U.S.C. § 1101 *et seq.*, *see* Pub. L. No. 107-217, § 1, 116 Stat. 1129 (2002), as implemented by Federal Acquisition Regulation ("FAR") Part 36. Two aspects of A&E services procurement — as governed by statute, regulation, and the Synopsis itself — are relevant here.

First, the procedure for award of an A&E services contract is unique. Under FAR Part 36, prospective contractors do not submit a proposal, but instead a Standard Form ("SF") 330 — also referred to as a "capability statement," *see, e.g.*, A.R. at 1782 — setting out the bidder's qualifications. FAR § 36.603; A.R. at 30. *Inter alia*, a capability statement calls for information about the prospective contractor's

---

[1] Pl.'s Mot. for J. on the Administrative R. ("Pl.'s MJAR") (ECF 24); Government's Cross-Mot. for J. on the Administrative R. & Resp. ("Government's MJAR") (ECF 25); Vanguard's Cross-Mot. for J. on the Administrative R. & Resp. ("Vanguard's MJAR") (ECF 26); Pl.'s Resp. & Reply ("Pl.'s R&R") (ECF 27); Vanguard's Reply (ECF 28); Government's Reply (ECF 29); Government's Supp. Br. (ECF 39); Vanguard's Supp. Br. (ECF 40); Pl.'s Supp. Br. (ECF 41); Tr. (ECF 43).

"team" (Section C), "key personnel" who would be responsible for performance (Section E), and "example projects" illustrating the prospective contractor's qualifications (Section F). *See, e.g.*, A.R. at 55, 57–83.

After it receives capability statements, the procuring agency performs a preliminary screening and enters discussions with at least three prospective contractors. 40 U.S.C. § 1103(c), (d). The agency then "select[s], in order of preference, at least 3 firms that the agency head considers most highly qualified to provide the services required." 40 U.S.C. § 1103(d). Finally, the agency undertakes negotiation of a contract with the selected firms in order of preference. 40 U.S.C. § 1104(b). Negotiations begin with an agency-issued request for a proposal from the highest-ranked firm. *See* FAR § 36.606.

Second, a contract for A&E services must go to a "firm" with an architecture or engineering license. Under the Brooks Act, bidding, discussions, and negotiations must be with "firms." *See* 40 U.S.C. §§ 1103, 1104. "Firm" is defined as "an individual, firm, partnership, corporation, association, or other legal entity permitted by law to practice the profession of architecture or engineering." 40 U.S.C. § 1102(3); *see also* FAR § 36.102 ("*Firm* in conjunction with architect-engineer services, means any individual, partnership, corporation, association, or other legal entity permitted by law to practice the professions of architecture or engineering."). By definition, in other words, only legal entities with relevant licensures may participate in Brooks Act procurements.[2]

That brings us to the Synopsis in this case. The Synopsis provided that:

> In accordance with the FAR 36.601-4(b) contracts for architect-engineer services may be awarded to offerors permitted by law to practice the professions of architecture or engineering. If a firm's office is permitted by law to practice these professions, offerors must submit proof to this effect as required by FAR 36.601-4(b).

A.R. at 34.

The Synopsis also specified its own meaning of the term "firm": "Any reference to 'A-E', [']A-E firm', or 'firm' includes teaming arrangements." A.R. at 30. The Synopsis did not define "teaming arrangements," but the SF 330 section calling for

---

[2] A regulation underscores the point: "Contracting officers may award contracts … to any firm permitted by law to practice the professions of architecture or engineering." FAR § 36.601-4(b). The parties seem to agree that "may" in this context is mandatory, not optional or hortatory. Although unusual, that reading is permissible when statutory context warrants. *See Kentucky, Educ. Cabinet, Dep't for the Blind v. United States*, 424 F.3d 1222, 1227–29 (Fed. Cir. 2005); *Marathon Oil Co. v. United States*, 374 F.3d 1123, 1138–39 (Fed. Cir. 2004); c*f. Mason v. Fearson*, 50 U.S. (9 How.) 248, 259 (1850).

disclosure of the "team" includes joint-venture partners and subcontractors. *See, e.g.*, A.R. at 55; *see also* FAR § 9.601(2) ("*Contractor team arrangement*, as used in this subpart, means an arrangement in which … [a] potential prime contractor agrees with one or more other companies to have them act as its subcontractors under a specified Government contract or acquisition program.").

NASA received capability statements from five bidders, including Accura and Vanguard. A.R. at 51–312. Accura represented that it is licensed to practice engineering in Georgia. A.R. at 54. But Vanguard did not represent that it was licensed in either architecture or engineering.[3]

Instead, Vanguard submitted the engineering licensure of a company called Hargrove Engineers + Constructors ("Hargrove"). A.R. at 307. Vanguard represented that Hargrove would be part of its "team" as a subcontractor. A.R. at 259. Vanguard explained that if awarded the contract, Vanguard would provide [. . .] while Hargrove performs [. . .]. *Id.*

NASA reviewers eliminated one firm from contention. A.R. at 323. The reviewers individually rated the other four and reached a set of consensus scores. A.R. at 327–39, 749–50. Discussions with Accura, Vanguard, and one other firm led to a second set of consensus scores that ranked Vanguard first, with Accura second. A.R. at 327–39, 750–765. After negotiations, NASA awarded the contract to Vanguard, *see* A.R. at 802–04, 1759–62, and Accura filed a protest with the Government Accountability Office. A.R. at 1951–67. When that protest was denied, Accura filed its complaint in this Court. *See* A.R. at 2345–55.

## DISCUSSION

### I. Legal Standards

#### A. Jurisdiction

To reach the merits of the case, I must first determine that the Court has jurisdiction over Accura's claims. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). This Court's jurisdiction in bid protests rests on the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, § 12(a)–(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)); *see Dyonyx, L.P. v. United States*, 83 Fed. Cl. 460, 464–65 (2008). This Court has jurisdiction "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to … the award of a

---

[3] The parties agree that Vanguard was not licensed in architecture or engineering at the time it submitted its capability statement. The parties represent that Vanguard may have relevant licensures now.

contract or any alleged violation of statute or regulation in connection with a procurement[.]" 28 U.S.C. § 1491(b)(1). This Court therefore has jurisdiction over the subject matter.

Accura must also have standing to challenge the contract award. Accura has Article III standing because it claims an injury — specifically, rejection of its bid and award to Vanguard — which is traceable to the allegedly defective procurement process and which could be redressed by this Court. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

Until recently, the Tucker Act's requirement that only an "interested party" could file a bid protest was considered a "threshold jurisdictional issue" too. *See Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002). The Federal Circuit recently clarified that the "interested party" requirement goes only to "statutory standing," and is therefore not jurisdictional in a strict sense. *CACI, Inc.-Fed. v. United States*, 67 F.4th 1145, 1151 (Fed. Cir. 2023) (holding that *Myers Investigative* is abrogated in that respect); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127–28 n.4 (2014) (explaining that statutory standing relates not to jurisdiction but to "whether a legislatively conferred cause of action encompasses a particular plaintiff's claim").

When a protestor "challeng[es] the … determination that [the protestor's] own bid had disqualifying deficiencies," statutory standing overlaps with the merits. *CACI*, 67 F.4th at 1152. Nonetheless, "when the plaintiff is arguing that the [government] made an error in evaluating the bid of *another* contractor," a judicial determination of statutory standing is still "required," although it need not be made before reaching the merits. *Id.* (emphasis added).

The Federal Circuit has developed a two-part test for "interested party": A plaintiff must show that it (1) is an "actual or prospective bidder," and (2) "possesses the requisite direct economic interest." *Rex Serv. Corp. v. United States,* 448 F.3d 1305, 1307 (Fed. Cir. 2006) (citing *Myers Investigative*, 275 F.3d at 1369 (itself citing *Lujan*, 504 U.S. at 561)). There is no question that Accura is an actual bidder. Furthermore, neither the government nor Vanguard disputes that Accura has a "direct economic interest." *See Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358–59 (Fed. Cir. 2009). A direct economic interest exists if there was a substantial chance that the protestor's proposal "could have been the basis for an award." *Velocity Training, LLC v. United States*, 161 Fed. Cl. 201, 206 (2022). If not for the errors Accura alleges, NASA would likely have rejected Vanguard's bid and conducted negotiations with Accura, the next most highly reviewed bidder. *See CACI,* 67 F.4th at 1152 (explaining that for purposes of statutory standing, the Court need only

"mak[e] a preliminary determination … with respect to the plaintiff's chances of securing the contract"). Therefore, Accura has a direct economic interest and is an interested party.

### B. Standard of Review

This Court reviews bid protests "pursuant to the standards set forth in section 706 of title 5," *i.e.*, the Administrative Procedure Act. 28 U.S.C. § 1491(b)(4); *see Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004). The Court must consider whether the contracting agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial." *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013). There are two bases for setting aside government procurements as arbitrary and capricious: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001); *see also Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005); *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed. Cir. 2000). Accura alleges that NASA's evaluation of the bids both lacked a rational basis and violated applicable laws.

The first route involves determining "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Impresa*, 238 F.3d at 1332–33 (quotes omitted) (citing *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)). To succeed under that standard, "the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Id.* at 1333 (quotes omitted) (citing *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C. Cir. 1994)). The second route requires the disappointed bidder to "show a clear and prejudicial violation of applicable statutes or regulations." *Id.* (quotes omitted). In either case, review is "highly deferential" to agency decision-making. *Glenn Def. Marine,* 720 F.3d at 907 (citing *Advanced Data Concepts*, 216 F.3d 1054, 1058 (Fed. Cir. 2000)).

"Further, in addition to identifying 'a significant error in the procurement process,' a protestor must show 'that the error prejudiced it.'" *Wisconsin Physicians Serv. Ins. Corp. v. United States*, 151 Fed. Cl. 22, 32 (2020) (quoting *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996)). "[T]o establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract." *Data Gen. Corp.*, 78 F.3d at 1562. The Federal Circuit has described the same standard using other similar formulations, *i.e.*, that a protestor must "show that

there was a 'substantial chance' it would have received the contract award but for the [agency's] errors in the bid process." *Bannum, Inc.*, 404 F.3d at 1358.

When resolving motions for judgment on the administrative record under Rule 52.1(c), this Court proceeds "as if it were conducting a trial on the record." *Bannum, Inc.*, 404 F.3d at 1354 (addressing former RCFC 56.1); *see also Young v. United States*, 497 F. App'x 53, 58–59 (Fed. Cir. 2012).

## II. Merits

### A. Compliance with the Brooks Act

Accura argues that NASA violated the Brooks Act and its implementing regulations by awarding the contract to Vanguard. I agree, for the text of the relevant laws is plain. Only a licensed firm can participate in a Brooks Act procurement or receive a Brooks Act award for A&E services. 40 U.S.C. §§ 1102–1104; FAR § 36.601-4(b). Vanguard — the awardee firm — did not have any such licensure. Therefore it was ineligible for award.

In response, Vanguard and the government argue that Vanguard was entitled to rely on *Hargrove's* licensure. According to their theory, the Synopsis defined "firm" to include "teaming arrangements," A.R. at 34, and because Hargrove was part of the Vanguard "team," its licensure counts. That theory fails for several reasons.

First, and most obviously, it conflicts with the term "firm" in the Brooks Act and its implementing regulations. Only a "firm" may participate in Brooks Act procurement processes or receive a contract for A&E services. *See* 40 U.S.C. §§ 1103, 1104; FAR § 36.601-4(b). And a "firm" is defined as "an individual, firm, partnership, corporation, association, or other legal entity permitted by law to practice the profession of architecture or engineering." 40 U.S.C. § 1102(3); *see also* FAR § 36.102 ("*Firm* in conjunction with architect-engineer services, means any individual, partnership, corporation, association, or other legal entity permitted by law to practice the professions of architecture or engineering."). A "firm" eligible for Brooks Act contracting, in other words, must *itself* be a "legal entity" with the necessary licensure.

Vanguard, not Hargrove, was the "legal entity" that submitted a capability statement, then engaged in discussions and negotiations with NASA. Vanguard and Hargrove were legally separate: A subcontracting arrangement does not ordinarily create a new "legal entity."[4] *See Dorsey Trailers, Inc. v. N.L.R.B.*, 134 F.3d 125, 130 (3d Cir. 1998); *LaSalle Partners v. United States*, 48 Fed. Cl. 797, 803–04 (2001); *see*

---

[4] Vanguard and the government do not argue that the relationship between Vanguard and Hargrove was a "partnership" or "association" within the meaning of those terms.

*also Entity*, Black's Law Dictionary (11th ed. 2019) ("An organization … that has a legal identity apart from its members or owners."); *Legal entity*, *id.* ("A body … that can function legally, sue or be sued, and make decisions through agents."). A joint venture between Vanguard and Hargrove might have qualified, but Vanguard does not claim that one existed. Even if the Synopsis purported to expand the definition of a "firm" to include licensures held by a bidder's team, A.R. at 34, it could not expand the universe of potential contractors beyond what the statutes and regulations allow. *See SEKRI, Inc. v. United States*, 163 Fed. Cl. 562, 578 (2022); *see also Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 995 (Fed. Cir. 2018); *Blue & Gold Fleet, LP v. United States*, 70 Fed. Cl. 487, 512 (2006) ("An agency has no discretion regarding whether or not to follow applicable laws and regulations."), *aff'd*, 492 F.3d 1308 (Fed. Cir. 2007).

At argument, the government pointed to FAR § 9.601, which defines teaming arrangements to include subcontracting relationships. Tr. at 56. That provision is irrelevant because it applies only "in this subpart," FAR § 9.601, a set of regulations establishing that teaming arrangements are "desirable" and that the government should "recognize the[ir] integrity and validity[.]" FAR §§ 9.602, 9.603. And suppose the definition does apply to the Synopsis: What matters for Vanguard's eligibility is not whether the term "teaming arrangement" in the Synopsis includes an offeror's subcontractors, but whether the term "firm" in the Brooks Act does. The regulation the government cites says nothing about that. On the contrary, it underscores the fact that the Brooks Act's implementing regulations do *not* define a "firm" to include a contractor-subcontractor team.

In fact, the applicable regulations at FAR Part 36 distinguish between firms and subcontracting relationships. One provision related to agency negotiations with prospective contractors provides that "[b]ecause selection of firms is based upon qualifications, the extent of any subcontracting is an important negotiation topic. The clause prescribed at 44.204(b) … limits a firm's subcontracting to firms agreed upon during negotiations." FAR § 36.606(e). If subcontractors were considered *part* of the firm engaging in negotiations, that language would be essentially unintelligible. A subcontractor like Hargrove might be part of a "team," but it is not part of the "firm," and therefore does not make Vanguard eligible under the Brooks Act.

Second, assuming (all law to the contrary) that Vanguard and Hargrove could permissibly be treated as part of the same "firm," it still would not be clear that the Synopsis's text requires giving Vanguard credit for Hargrove's licensure. The relevant part of the Synopsis stated that contracts would be awarded to licensed "*offerors*" — not "firms." A.R. at 34 (emphasis added). Hargrove was not an "offeror"; Vanguard was. The key paragraph of the Synopsis also stated that awards would be

- 8 -

made "[i]n accordance with the FAR 36.601-4(b)," *id.*, the regulation limiting A&E services contracts to "firm[s] permitted by law to practice the professions of architecture or engineering." *See* FAR § 36.601-4(b). That suggests that even if the Synopsis term "firm" covers Vanguard and Hargrove together, the Synopsis still harmonizes with the Brooks Act when it comes to whose licensures count and who is actually eligible for the award.

Vanguard and the government contend that the Synopsis used the terms "offeror" and "firm" interchangeably. But that is not the best reading of the Synopsis. Although some uses of the term "firm" might be read as referring to the offeror, *see* A.R. at 34 ("Proposing firms shall meet the following criteria to be further evaluated: …."), other references to the offeror are specific to the entity providing the capability statement. In the key paragraph, for example, the Synopsis provides that while "contracts for architect-engineer services may be awarded to [licensed] offerors, … [i]f a firm's office is permitted by law to practice these professions, offerors must submit proof to this effect[.]" *Id.* Distinct definitions of "offeror" and "firm" fit comfortably in that language: The offeror must itself be licensed, but if other offices within the offeror's team ("firm") hold licensures, the offeror should say so.

Given that the text does not support the reading proposed by Vanguard and the government, they point to language in a document NASA prepared for guiding evaluators. Tr. at 64–65; A.R. at 41 ("The following criteria will be used in the preliminary screening of the A-E firms (Offerors) responding to this solicitation …."). That language does imply that NASA viewed the terms "firm" and "offeror" as equivalent. But the government conceded at argument that the cited language was never made public until now and was not available to offerors during the procurement process. Tr. at 66. The Synopsis should be interpreted as it would be read by a reasonable prospective contractor, not in light of the agency's undisclosed views and intentions. *Diggins Equip. Corp. v. United States*, 17 Cl. Ct. 358, 360 (1989) ("Plaintiff cannot be held to the subjective unexpressed intent of defendant.").

Vanguard argues as a fallback that Accura forfeited its Brooks Act compliance arguments by failing to raise them during the procurement.[5] Vanguard's MJAR at 8. Where an ambiguity is evident on the face of a contracting document, bidders must point it out to the agency "prior to the close of the bidding process" or else "waive[] [their] ability to raise the same objection afterwards in a § 1491(b) action in the Court of Federal Claims." *Blue & Gold*, 492 F.3d at 1315; *see also COMINT Sys. Corp. v.*

---

[5] Accura raised its Brooks Act argument in its opening brief, albeit not with perfect clarity. *See* Pl.'s MJAR at 18–19. Accura explained the argument in more detail in its reply, *see* Pl.'s R&R at 4–8, and the government and Vanguard had the opportunity to respond. I therefore consider the argument to be preserved for purposes of litigation.

- 9 -

*United States*, 700 F.3d 1377, 1382–83 (Fed. Cir. 2012) (applying *Blue & Gold* to defects in the solicitation arising before award). The Federal Circuit refers to that type of flaw as "patent," *Blue & Gold*, 492 F.3d at 1313, 1315, as opposed to latent issues that can be addressed in litigation afterward. *See, e.g.*, *COMINT*, 700 F.3d at 1382 n.5.

As noted above, though, the Synopsis is consistent with Accura's reading, especially in light of Brooks Act requirements for A&E services contracting. *See Inserso Corp. v. United States*, 961 F.3d 1343, 1350 (Fed. Cir. 2020) ("Offerors in a government solicitation are 'charged with knowledge of law and fact appropriate to the subject matter.'") (quoting *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1314 (Fed. Cir. 2016)). Accura's challenges thus go not to the Synopsis itself, but to NASA's misapplication of the Synopsis's terms in the solicitation process.[6] "[A]s a general matter, a bidder cannot be expected to challenge an agency's evaluation of bids, in contrast to the terms of the solicitation, until the evaluation occurs." *Bannum, Inc. v. United States*, 779 F.3d 1376, 1381 (Fed. Cir. 2015); *see also Raytheon Co. v. United States*, 809 F.3d 590, 598 (Fed. Cir. 2015) (similar); *WaveLink, Inc. v. United States*, 154 Fed. Cl. 245, 266 (2021) (similar); *Percipient.ai, Inc. v. United States*, 165 Fed. Cl. 331, 340 (2023) (finding no *Blue & Gold* waiver when the solicitation was facially consistent with statute).

At most, the fact that NASA interpreted the Synopsis to violate the Brooks Act reveals a latent ambiguity, *i.e.*, one "which is not apparent on the face of the document, could not be discovered by reasonable and customary care, and is not so patent and glaring as to impose an affirmative duty on plaintiff to seek clarification." *Per Aarsleff*, 829 F.3d at 1312 (quoting *Analytical & Research Tech., Inc. v. United States*, 39 Fed. Cl. 34, 46 (1997)); *see also LAI Servs., Inc. v. Gates*, 573 F.3d 1306, 1316 (Fed. Cir. 2009) ("[T]he bar to proving patent ambiguity is high[.]"). Vanguard argues that Accura could have become aware that Vanguard lacked licensure during the award process and should have raised its objections then. Vanguard's Supp. Br. at 3. That has a grain of truth: A contractor is obligated to raise latent ambiguities when it "knows or has reason to know that the [government], unaware of the contractor's interpretation, holds an interpretation different than its own[.]" *M.R. Pittman Grp., LLC v. United States*, 68 F.4th 1275, 1284 (Fed. Cir. 2023) (quoting *HPI/GSA 3C, LLC v. Perry*, 364 F.3d 1327, 1336–37 (Fed. Cir. 2004)). Sometimes that even requires contractors to check extrinsic sources of public information that are incorporated into the terms of a procurement document. *See id.* (citing *Per Aarsleff*, 829 F.3d at 1313). But it does not follow that Accura was required to dig into

---

[6] Vanguard implicitly admits as much. Vanguard's Supp. Br. at 3.

- 10 -

other offerors' qualifications, discover that Vanguard was not licensed, infer that NASA had not just erred in its evaluation but adopted a different reading of the Synopsis, and lodge its objection before award. The Federal Circuit has not yet extended *Blue & Gold* that far.

There is another problem with the *Blue & Gold* forfeiture argument. Assuming Vanguard and the government are right that the Synopsis is facially susceptible to two meanings, the reading they propose would violate the Brooks Act by authorizing awards to "firms" that are not statutorily qualified to provide A&E services. That means the supposedly patent ambiguity is nothing more than a choice between a reading that comports with a statute and one that does not. But that is not enough to trigger Accura's obligations under *Blue & Gold*.[7]

To begin with, a procurement document is only patently ambiguous for purposes of *Blue & Gold* if more than one interpretation of the document is "reasonable." *Blue & Gold*, 492 F.3d at 1316; *Banknote Corp.*, 365 F.3d at 1353 ("The solicitation is ambiguous only if its language is susceptible to more than one reasonable interpretation."); *see also Inserso Corp.*, 961 F.3d at 1349 (explaining that "[a] defect in a solicitation is patent if it is an *obvious* omission, inconsistency, or discrepancy of significance") (emphasis added). If there is an obvious interpretation of the document that is consistent with other law, a reading that *violates* other law is not a reasonable one. *See Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 709 (2010) ("[I]f a solicitation term is susceptible to two interpretations one of which would render the solicitation unlawful, 'preference will be given to that [interpretation] which does not result in violation of law.'") (quoting *Great N. Ry. Co. v. Delmar Co.,* 283 U.S. 686, 691 (1931)), *abrogated on other grounds*, *Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326 (Fed. Cir. 2021)). Under the presumption of regularity, moreover, Accura was entitled to assume "that what appears regular is regular," *see United States v. Roses Inc.*, 706 F.2d 1563, 1567 (Fed. Cir. 1983), and therefore should not have had to anticipate that NASA intended to violate the Brooks Act. *See Percipient.ai*, 165 Fed. Cl. at 340.

Besides, the point of *Blue & Gold* is to ensure that "[v]endors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive the award[.]" *Weeks Marine*, 575 F.3d at 1363 (quoting *Blue & Gold*, 492 F.3d at 1314 (itself quoting *Argencord Mach. & Equip. v. United States,* 68 Fed.

---

[7] Offerors are required to raise patent *defects* in solicitations — that is, aspects of a solicitation that are obviously inconsistent with law — during the procurement in order to preserve objections. *Bannum, Inc.*, 779 F.3d at 1380; *Land Shark Shredding, LLC v. United States*, 842 F. App'x 589, 593 (Fed. Cir. 2021); *Burney v. United States*, 499 F. App'x 32, 34 (Fed. Cir. 2012). Because the Synopsis is at least consistent with Accura's reading, though, it could not have been patently defective.

Cl. 167, 175 n. 14 (2005))). Offerors and the government should instead "do what *they* are able to do to clear up patent ambiguities or defects before formation, thus helping to reduce future litigation and allowing expeditious contract formation." *Boeing Co. v. United States*, 968 F.3d 1371, 1380 (Fed. Cir. 2020). Those interests would not be well served if potential contractors — on pain of forfeiture in this Court — had to pester agencies to rule out colorable, hypothetical readings that would be illegal if adopted. In short, because Accura relied on a reasonable reading of the Synopsis, it did not waive its argument that NASA's preferred reading of the Synopsis violated the Brooks Act.

Errors in procurements only call for judicial correction when they are prejudicial. *E.g.*, *Brooks Range Contract Servs., Inc. v. United States*, 101 Fed. Cl. 699, 707 (2011). To show prejudice, Accura need not prove that "but for the errors [it] would have won the contract." *Bannum, Inc.*, 404 F.3d at 1358. Rather, in a post-award bid protest like this one, Accura must "show that there was a 'substantial chance' it would have received the contract award but for [NASA's] errors in the bid process." *Id.* That showing is simple enough here: Accura was the second most highly rated prospective contractor after Vanguard, A.R. at 327, and thus would have entered negotiations with NASA instead of Vanguard if Vanguard had been disqualified. A.R. at 38. Once a prospective contractor enters negotiations, there is at least a substantial chance it will receive the award.

The government argues that Accura cannot show prejudice because Accura's evaluation score was closer to the score of the next highest prospective contractor, a company called [. . .]. Government's MJAR at 23. But if Vanguard had been eliminated from the competition, [. . .] still would have ranked second; Accura would have been first, and therefore entitled by statute to negotiate. A.R. at 38; 40 U.S.C. § 1104. That is enough to establish prejudice, regardless of whether Accura would ultimately have received the contract. *Bannum, Inc.*, 404 F.3d at 1358.

The government also argues that because Vanguard has since received licensure that would qualify it under the Brooks Act, remand for reconsideration of the procurement would be futile. Government's Supp. Br. at 3. Remand under the terms of the Administrative Procedure Act "may not be appropriate when … the result of a potential remand is a foregone conclusion[.]" *Thomassee v. United States*, 158 Fed. Cl. 233, 239 (2022) (citing *Diversified Maint. Sys., Inc. v. United States*, 74 Fed. Cl. 122, 127 (2006)); *see CRAssociates, Inc. v. United States*, 95 Fed. Cl. 357, 384 (2010) (addressing bid protest remand processes in light of the Administrative Procedure Act).

But on remand NASA will have choices and decisions to make. Vanguard claims that it received licensure after the contract was awarded, and so — to its credit — "acknowledges that this information was not before [NASA] when it was evaluating proposals." Vanguard's MJAR at 5, 8 n.1. If NASA does not take the opportunity to negotiate with Accura based on the existing procurement record, NASA may have to give potential contractors the opportunity to supplement the record with new information. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1908 (2020). Or perhaps NASA will opt for yet other approach. Given the constraints of the administrative record and the procurement process, the Court can only speculate how NASA will proceed. The mere possibility that NASA will reach the *same* decision on a *new* record is not enough to negate Accura's "substantial chance" of obtaining the contract. *See Bannum, Inc.*, 404 F.3d at 1358.

I shall therefore, as provided below, remand to NASA for further proceedings.

**B. Other issues**

Although the foregoing is sufficient to justify remand to NASA, Accura has raised several other arguments. I briefly address them in order to narrow the remaining issues.

*1. Small Business Administration referral*

The procurement at issue was, as briefly mentioned above, an 8(a) small-business set-aside. A.R. at 30. The parties do not dispute that Accura and Vanguard, standing alone, are both qualified small businesses. But Accura contends that Vanguard is only a puppet for Hargrove, a larger company that would not qualify on its own. Pl.'s R&R at 13–17. Accura argues that NASA should have referred Vanguard to the Small Business Administration ("SBA") for a determination of whether Vanguard was in fact a small business qualified to compete for the contract. *See* 13 C.F.R. §§ 121.901, 121.1001 *et seq.* (authorizing the SBA to decide referrals); *see also* FAR § 19.301-1(f).

When a procurement is set aside for small businesses, other businesses are not allowed to sneak in like cowbirds in a robin's nest. The "ostensible subcontractor rule" applies that principle in situations where although a small business is the nominal offeror, a subcontractor that is not a small business would do the work and reap the benefits. *See, e.g.*, *Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1361 (Fed. Cir. 2015); *Warrior Serv. Co., LLC v. United States*, 149 Fed. Cl. 594, 609–10 (2020). The SBA, which makes business size determinations upon request from other government agencies, *see* 13 C.F.R. §§ 121.901, 121.1001 *et seq.*, has ruled that "[a]n ostensible subcontractor is a subcontractor that performs primary and vital

requirements of a contract." *TKC Tech. Sols., LLC, Appellant*, SBA No. SIZ-4783 at *6 (May 10, 2006). The SBA applies that standard through what it calls the "unusual" or "undue" reliance test, looking to "all aspects of the prime-subcontractor relationship[.]" *Id.*; *see also id.* at *9. Among other factors, the SBA considers whether the offeror could receive the award and manage the contract without the proposed subcontractor. *Id.* at *9–10.

Challenges to a contracting agency's non-referral of a bidder to the SBA for a size determination fall under this Court's bid-protest jurisdiction. *Harmonia Holdings Grp., LLC v. United States*, 999 F.3d 1397, 1403 (Fed. Cir. 2021). The Federal Circuit has not resolved whether unsuccessful offerors may bring such challenges, though it has assumed they may. *Id.* at 1405. Regardless, this Court's review is narrow and demanding. Contracting officers have no "affirmative obligation to conduct an independent investigation into an offeror's" status as a small business unless the proposal, on its face, calls the offeror's status into question. *Id.* at 1405–06 (collecting cases). Moreover, because "contracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process," *id.* (quoting *PAI Corp. v. United States*, 614 F.3d 1347, 1351 (Fed. Cir. 2010)) (alteration omitted), the protester's burden is "not simply to show that [another offeror's] proposal contained some suggestion of an ostensible subcontractor relationship, but instead that the indicia of such a relationship were so compelling that the contracting officer necessarily abused his discretion by failing to refer [the other offeror] to the SBA for a size status determination." *Id.* at 1407.

Here, Accura is certainly correct that aspects of Vanguard's proposal "contain[] some suggestion of an ostensible subcontractor relationship." *Id.* at 1406. Considering Vanguard's reliance on Hargrove's licensure, personnel, and past experience — and the limited role Vanguard proposed playing in its own contract, A.R. at 259 — it seems at least plausible that Vanguard could not have bid for the contract or managed an award on its own. The parties also do not dispute that Hargrove could not have competed for the contract without Vanguard.

Whether NASA "necessarily abused [its] discretion by failing to refer [Vanguard] to the SBA for a size status determination," *see Harmonia Holdings*, 999 F.3d at 1407, is a hard question. The question is even harder than usual in this case: Accura argues that Vanguard should have been referred to SBA based on the capability statement alone, Tr. at 35–37, but the government and Vanguard say such a referral would have been premature, both practically and under the relevant regulations, *id.* at 77–78.

Because I have held that Vanguard's lack of licensure should have eliminated it from contention, I need not resolve those issues. The procurement process on remand may or may not include Vanguard at all. If Vanguard does participate, its representations might differ materially from those in its original capability statement. I merely emphasize that, on remand, NASA should take note of the ostensible subcontractor rule and refer to the SBA for a size determination if any prospective contractor's proposal warrants it.

*2. Other issues*

Accura's remaining arguments about the review process are more easily dispensed with.

Vanguard's capability statement — as discussed above — relied heavily on Hargrove's personnel and work experience. Only one individual in Vanguard's Section E list of key personnel was a Vanguard employee,[8] and most of the rest were employed by Hargrove. A.R. at 260–81. The example projects Vanguard listed in Section F were all Hargrove's, though Vanguard may have played a role in some of them. A.R. at 283–92. Accura argues that even aside from Vanguard's status as a small business, the company's reliance on Hargrove should have been disqualifying. Pl.'s MJAR at 23–24, 26–27.

But even though the Brooks Act forbade NASA from treating Hargrove's licensure as if it were Vanguard's, nothing prohibited the agency from considering Hargrove's personnel and projects. The Synopsis required NASA to treat Hargrove as part of Vanguard's team. A.R. at 34. Outside the licensure issues, Accura points to no statute or regulation prohibiting NASA from doing so.

Accura claims that Vanguard's reliance on Hargrove staff casts doubt on whether Vanguard would comply with limitations on subcontracting; specifically, the requirement that Vanguard itself perform at least 50 percent of the cost of the contract involving payments to personnel. Pl.'s MJAR at 19–20; FAR § 52.219-14; *see* A.R. at 30. But the Synopsis did not require that capability statements disclose *all* personnel, only "key personnel who will actually perform the major duties" under an awarded contract, A.R. at 35, so nose-counting disclosed individuals says little about how contract funds would be spent. Vanguard certified that it would comply with the subcontracting requirement. A.R. at 297, 1814. Although there are circumstances where an agency must look past the form of a certification and consider whether an offeror would satisfy the substance, *Allied Tech. Grp., Inc. v. United States*, 649 F.3d

---

[8] Accura claims that individual was in fact employed by Hargrove, Pl.'s MJAR at 26, but has not moved to supplement the record and points to no judicially noticeable evidence to the contrary.

- 15 -

1320, 1330 (Fed. Cir. 2011); *Per Aarsleff*, 829 F.3d at 1315, NASA was within its discretion not to do so here.

Accura also objects that during the discussions phase of evaluating capability statements, NASA may have relied on additional information from Vanguard about key personnel, Vanguard's own projects, or the role it may have played in the Hargrove projects disclosed in Section F. Pl.'s MJAR at 24–25, 28–29. Nothing in the Synopsis or applicable statutes and regulations expressly foreclosed NASA from inquiring about additional information during discussions. At most, the Synopsis states that information in the capability statement would provide the "[b]asis for evaluation." A.R. at 35 (personnel). The discussions required by the Brooks Act, though, would be an empty formality if they did not allow prospective contractors to communicate at least some new information. In general, courts avoid interpretations of statutes that would render their terms meaningless. *Sharp v. United States*, 580 F.3d 1234, 1238 (Fed. Cir. 2009) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).

Accura's other claim about the review process is that NASA rounded Vanguard's and Accura's scores inconsistently — specifically, by rounding Accura's half-point scores down while rounding Vanguard's up. Pl.'s MJAR at 36–37. The Synopsis, however, did not call for rounding scores at all: It called for reviewers to reach a consensus after internal discussions. A.R. at 39. There is nothing improper — or even surprising — about some scores going up while others went down. I therefore conclude that NASA's evaluation process was not arbitrary or capricious.

Accura's remaining objections go primarily to NASA's technical review of the capability statements, especially Vanguard's. *E.g.*, Pl.'s MJAR at 29–35, 37. Because remand to the agency may moot those issues, I do not reach them.

### III. <u>Injunctive Relief</u>

Accura has requested an injunction. Pl.'s MJAR at 38–40. The following test applies:

> Once a plaintiff has succeeded on the merits, in determining whether to grant a permanent injunction, the court considers three factors: (1) whether the plaintiff will suffer irreparable harm if the procurement is not enjoined; (2) whether the harm suffered by the plaintiff, if the procurement action is not enjoined, will outweigh the harm to the government and third parties; and (3) whether granting injunctive relief serves (or is at least not contrary to) the public interest.

*Fed. Acquisition Servs. Team v. United States*, 124 Fed. Cl. 690, 707–08 (2016) (citing *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009); *PGBA, LLC*

*v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004); and *Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 383 (2013)). Limited injunctive relief is appropriate to protect Accura's rights on remand.

First, I conclude that injunctive relief is necessary to protect Accura from irreparable harm. Accura lost the opportunity to negotiate for a contract because NASA erroneously negotiated with — and awarded the contract to — Vanguard, which should have been out of the running. *WaveLink,* 154 Fed. Cl. at 283, 288 (finding irreparable harm when there was "a realistic possibility that [protester] could secure an award if the ineligible offerors are removed"); *see also, e.g.*, *T Square Logistics Servs. Corp. v. United States*, 134 Fed. Cl. 550, 560 (2017) ("[P]laintiff has shown that absent injunctive relief, it will suffer irreparable harm in the form of a lost opportunity to compete for the award at issue."); *RLB Contracting, Inc. v. United States*, 118 Fed. Cl. 750, 761 (2014) ("[I]n the context of a bid protest, the loss of an opportunity to compete for an award for which a party would not otherwise be disqualified is sufficient injury to warrant injunctive relief."); *PGBA, LLC*, 57 Fed. Cl. at 664 ("[A] lost opportunity to compete may constitute an irreparable harm[.]"). If an injunction does not issue, NASA might proceed with its award to Vanguard, which would also irreparably harm Accura. *Myriddian, LLC v. United States*, 165 Fed. Cl. 650, 658 (2023) ("[L]oss of potential work and profits from a government contract constitutes irreparable harm.") (quoting *Superior Optical Labs, Inc. v. United States*, 150 Fed. Cl. 681, 695 (2020) (itself quoting *Macaulay-Brown, Inc. v. United States*, 125 Fed. Cl. 591, 606 (2016))).

Second, the government has not identified any harm that might result from an injunction, except that the eventual award of the contract "is anticipated to result in a cost savings to the Government." *See* Government's MJAR at 25. That may well be true, but it will presumably also be true when NASA makes a proper award. Whatever the government's ultimate goals in a procurement — as in any other regulatory process — the government has to follow the applicable law on the way there. Except in the "exceptional case," the government's dissatisfaction with not reaching its goals faster or more directly is essentially irrelevant for purposes of balancing the harms. *CW Gov't Travel, Inc. v. United States*, 110 Fed. Cl. 462, 495 (2013) (quoting *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 715–16 (2006)) (itself quoting *Ellsworth Assocs., Inc. v. United States*, 45 Fed. Cl. 388, 399 (1999)). Even if it does count, it does not outweigh the obvious injury to Accura, which was improperly shut out of negotiating a contract. I therefore conclude that the balance of harms favors injunctive relief to protect Accura. *See T Square*, 134 Fed. Cl. at 560.

Third, "[t]he public interest always favors the correct application of law." *RLB Contracting*, 118 Fed. Cl. at 761. Award of a contract to a bidder that was statutorily ineligible disserves the public interest. *Myriddian*, 165 Fed. Cl. at 658. Conversely, an injunction halting the procurement pending NASA's reconsideration under the correct legal standards would serve the public interest. "[W]here, as here, defendant erred, it is both proper and in the public interest, for the court to step in and protect the integrity of the procurement process." *T Square*, 134 Fed. Cl. at 561.

Because NASA should have the opportunity to reconsider its decisions on remand, I do not enjoin NASA to negotiate with Accura. Rather, the Court shall enjoin NASA not to award a contract under the Synopsis until it complies with the terms of the remand, as further explained below.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the administrative record is **GRANTED** and the government's and Vanguard's cross-motions are **DENIED**.

Pursuant to RCFC 52.2, the case is **REMANDED** for 60 days to NASA for further proceedings. NASA is **ORDERED** to proceed with the procurement consistent with this Opinion. NASA may enter negotiations with Accura, re-evaluate the capability statements, cancel the procurement, revise the Synopsis, or take other action consistent with this Opinion.

It is further **ORDERED** that no later than **October 13, 2023**, the parties shall file either a stipulation of dismissal or a joint status report including NASA's decisions on remand.

It is further **ORDERED** that if no stipulation of dismissal is filed, the parties shall file a joint status report no later than **November 13, 2023** proposing further proceedings in this case.

This case shall be **STAYED** pending NASA's decision.

NASA is **ENJOINED** from making an award under the Synopsis until further order of the Court or a joint stipulation of dismissal is filed, whichever comes first.

Pursuant to the Court's October 28, 2022 Protective Order (ECF 9), this Opinion has been issued under seal. The transcript of the July 25, 2023 hearing is under seal as well. The parties shall have two weeks to propose redactions and, accordingly, shall file notice of their proposed redactions no later than **August 28, 2023**. To aid the Court's evaluation of the proposed redactions and in light of the "presumption of public access to judicial records," *Baystate Techs., Inc. v. Bowers*, 283 F. App'x 808, 810 (Fed. Cir. 2008) (per curiam), each party shall file a memorandum

(or a joint memorandum if the parties agree) explaining why redactions are necessary for each item of information for which a redaction is proposed.

The Clerk is directed to serve a certified copy of this order on NASA via Robert Dallas, Contracting Officer, National Aeronautics and Space Administration, MSFC/Office of Procurement – PS32, Bldg. 4260, RM 129, Marshall Space Flight Center, Huntsville, Alabama 35812. *See* RCFC 52.2(b)(2).

**IT IS SO ORDERED**.

s/ Stephen S. Schwartz  
STEPHEN S. SCHWARTZ  
Judge